IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

\* \* \* \* \* \* \* \* \*

CHARLES M. LAVADIE,                    )
                                       )        2:07-CV-00287 BSJ
            Plaintiff,                 )
                                       )        **MEMORANDUM OPINION**
vs.                                    )        **& ORDER**
                                       )
CAPITOL ROOFING SERVICE,               )    ┌─────────────────────────────┐
                                       )    │          **FILED**          │
            Defendant.                 )    │  CLERK, U.S. DISTRICT COURT │
                                       )    │   August 5, 2008 (2:31pm)   │
                                       )    │      DISTRICT OF UTAH       │
                                       )    └─────────────────────────────┘
                                       )

\* \* \* \* \* \* \* \* \*

This matter is before the court on defendant Capitol Roofing Service's ("Capitol

Roofing") Motion for Summary Judgment (dkt. no. 18) (the "Motion"). The court heard oral

argument on the Motion on May 29, 2008. David J. Holdsworth appeared on behalf of plaintiff

Charles M. Lavadie ("Lavadie"), and Chris Wangsgard appeared on behalf of defendant Capitol

Roofing. After considering the parties' respective arguments, the court took the matter under

advisement. The court has carefully considered the parties' briefs and arguments, as well as the

law and facts relevant to the Motion. Now being fully advised, the court enters the following

Memorandum Opinion & Order.

I.      **BACKGROUND**

        The following facts are undisputed.

        On October 8, 1999, Lavadie signed an application for employment seeking a position

with Capitol Roofing. Thereafter, Capitol Roofing hired Lavadie. On January 31, 2000, while

working as a roofer for Capitol Roofing, Lavadie fell from a roof and was seriously injured. As

a result of his injuries, Lavadie was hospitalized and received medical treatment including surgery on his left ankle, which was fractured as a result of his fall.

On or around January 31, 2000, Capitol Roofing reported Lavadie's work-related accident to the Workers Compensation Fund of Utah.

On May 31, 2000, four months after his fall, Lavadie returned to Capitol Roofing for light duty work with some medical restrictions.  By December 7, 2000, Lavadie had recovered from his injuries such that all of his work restrictions were eliminated except for the restriction that he not perform roofing work that required him to climb or stand on pitched roofs.  From December of 2000 to July of 2002, Lavadie continued to work as a roofer for Capitol Roofing.  During this time, Lavadie performed work on flat roofs (such as single ply or hot tar roofs) essentially full-time.  Then in July of 2001, Lavadie asked that he no longer be assigned to work on hot tar roofs because standing and walking in tar was causing pain in his ankles.  According to Lavadie, "[t]his request was accommodated."  (Complaint (dkt. no. 2), at 3 ¶ 7; *see id.* at 7 ¶ 19.)

Approximately one year later, on or around June 24, 2002 and July 1, 2002, Lavadie asked to be transferred to Capitol Roofing's metal shop.  Lavadie told Brent Zimmerman, the owner of Capitol Roofing, that he was seeking the transfer based on his doctor's recommendation that he stop performing roofing work because of his injured ankles.  Lavadie also told Zimmerman that he was going to need additional medical treatment for his ankle injuries.  Although at the time of his discussion with Zimmerman, Lavadie was in fact able to continue to work on flat roofs as long as he was not required to walk in hot tar, he did not indicate that to Zimmerman.

On or around July 1, 2002, Zimmerman informed Lavadie that there were already two employees assigned to the metal shop and that there were no positions available in the shop. Lavadie acknowledges that when he asked to be transferred, there were two Capitol Roofing employees assigned to the available positions in the metal shop.  Zimmerman then terminated Lavadie as a Capitol Roofing employee.

In August of 2002, after his termination from Capitol Roofing, Lavadie had his right ankle fused—a surgery which was paid for by Lavadie's workers' compensation benefits.  By September or October of 2002, workers' compensation released Lavadie to return to work.  In late 2002, Lavadie was hired by and began working for a roofing company named Trojan Roofing.  From late 2002 until the time of his deposition in this case in September of 2007, Lavadie had worked for several roofing companies and a heating and air conditioning business, performing various jobs including but not limited to installing sheet metal duct work for heating and air conditioning systems in buildings, fabricating sheet metal, installing sheet metal on roofs, and installing single-ply roofs.

Lavadie is the main caregiver for his three children.  Lavadie is able to drive a car, mow the lawn, climb and perform work from ladders, and play pool.  With the assistance of pain medication, Lavadie is also able to hunt and fish.

On May 1, 2007, Lavadie brought this lawsuit against his former employer, Capitol Roofing.  Lavadie claims that he is a qualified individual with a disability under the Americans with Disabilities Act (the "ADA") and that Capitol Roofing violated the ADA by failing to accommodate his disability and by terminating him on the basis of his disability.  (Complaint at 5-20 (Lavadie's first and second causes of action).)  Lavadie also claims that Capitol Roofing

breached its employment agreement with him by terminating him in July of 2002.  (*Id.* at 20-22

(Lavadie's third cause of action).)  Finally, Lavadie claims that Capitol Roofing wrongfully

terminated him for seeking workers' compensation benefits.  (*Id.* at 22-24 (Lavadie's fourth

cause of action).)

Capitol Roofing has moved for summary judgment on each of Lavadie's four claims.

## II.   ANALYSIS

"The purpose of a summary judgment motion is to assess whether a trial is necessary.

*White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  In other words, there 'must be

evidence on which the jury could reasonably find for the plaintiff.'  *Panis v. Mission Hills Bank,*

*N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995)."  *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1216

(10th Cir. 2007).  Summary judgment is appropriate where there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  "The

court must examine the record to determine whether any genuine issue of material fact is in

dispute, and must construe the facts and reasonable inferences drawn therefrom in the light most

favorable to the nonmoving party."  *Holt v. Grand Lake Mental Health Ctr., Inc.*, 443 F.3d 762,

765 (10th Cir. 2006).

### A.   Lavadie's Disability Claims

Lavadie contends that Capitol Roofing violated the ADA by failing to accommodate his

disability by transferring him to the sheet metal shop and by terminating his employment

because of his purported disability.  The ADA prohibits employers from discriminating "against

a qualified individual with a disability because of the disability of such individual . . . ."  42

U.S.C. § 12112(a).  The ADA defines a "qualified individual with a disability" as "an individual

4

with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position . . . ." 42 U.S.C. § 12111(8). Thus, in order for Lavadie to establish a viable claim under either of his ADA claims, he must prove by a preponderance of the evidence that (1) he has a disability; (2) he is qualified for the position; and (3) Capitol Roofing discriminated against him because of his disability. *See Poindexter v. Atchison, Topeka & Santa Fe Railway Co.*, 168 F.3d 1228, 1230 (10th Cir. 1999).

The ADA defines the term "'disability' . . . with respect to an individual" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). Lavadie contends that he qualifies as having a disability under all three definitions. The court disagrees and, as discussed below, concludes that Lavadie has failed to offer sufficient evidence to raise a triable issue of fact regarding whether Lavadie has a disability as defined by the ADA.

### 1.    Impairment that Substantially Limits a Major Life Activity

To qualify as disabled under subsection (A) of the ADA's definition of disability, a plaintiff must "prove that he or she has a physical or mental impairment," "demonstrate that the impairment limits a major life activity," and "show that the limitation on the major life activity is 'substantial.'" *Toyota Motor Mfg. v. Williams*, 534 U.S. 184, 194-95 (2002) (quoting 42 U.S.C. § 12102(2)(A)).

> Whether the plaintiff has an impairment within the meaning of the ADA and whether the conduct affected is a major life activity for purposes of the ADA are questions of law for [the] court to decide. *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1129 (10th Cir. 2003). Ascertaining whether the impairment substantially limits the major life activity is a question of fact for the jury, although a court is not precluded from deciding the issue on a motion for summary judgment.

5

*Id.* at 1129, 1130 n.5.

*Holt*, 443 F.3d at 765 n.1.

A plaintiff asserting an ADA claim "must articulate with precision the impairment alleged." *Poindexter*, 168 F.3d at 1232.  Lavadie generally alleges that as a result of his work-related accident in January of 2000, he suffered injuries to his feet, ankles, and legs.  While Lavadie claims that he has "a non-paralytic orthopedic impairment," (Complaint at 5 ¶ 16), it is unclear to the court whether this alleged impairment relates to injuries Lavadie suffered in one or both of his ankles, to one or both of his feet, to one or both of his legs, or to some or all of the above.  Although Lavadie's description of his impairment is less than precise, Capitol Roofing does not dispute that Lavadie has an impairment, and the court will assume for purposes of Capitol Roofing's Motion that Lavadie has a recognized impairment.

A plaintiff asserting an ADA claim also "must articulate with precision . . . the major life activity affected by [his or her] impairment."  *Poindexter*, 168 F.3d at 1232.  According to Lavadie, his impairment substantially limits his ability to engage in the major life activities of "walking, standing, lifting, carrying, pushing, pulling, bending, stooping, squatting, kneeling, climbing and working."  (Complaint at 6 ¶ 17; Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment ("Opposition") (dkt. no. 22), at 17.)  Some of the activities upon which Lavadie relies—such as working, walking, standing, and lifting—are clearly recognized as major life activities under the ADA.  *See Poindexter*, 168 F.3d at 1231.  The Tenth Circuit has also indicated generally in an unpublished opinion that squatting is a major life activity.  *Prince v. Claussen*, 1999 U.S. App. LEXIS 5021, *13 (10th Cir. Mar. 22, 1999) ("Prince maintains his impairments have implicated his ability to walk, stand, run, lift,

throw, squat, and work.  Each constitutes a major life activity under the ADA.").  It is less clear whether carrying, pushing, pulling, bending, stooping, kneeling or climbing constitute major life activities for the purposes of the ADA, and Lavadie cites no authority to support his contention that they do.

During the hearing on Capitol Roofing's Motion, counsel for Lavadie also indicated that Lavadie was relying on the major life activity of "engaging in sporting activities, recreational activities"—in other words, "all of those recreational activities together that involve sports, running, jumping, heavy physical exertion with one's legs and feet."  (Transcript of Hearing, dated May 29, 2008 ("Tr. 5/29/08"), at 6:17 to 7:5 (Mr. Holdsworth).)  Lavadie does not cite any legal authority in support of his contention that these activities are recognized major life activities for purposes of the ADA.  *See Phillips v. Calhoun*, 956 F.2d 949, 953-54 (10th Cir. 1992) (referring to the plaintiff's responsibility to support his or her position with legal authority).  Various cases from within the Tenth Circuit seem to indicate that physical exertion and engaging in sporting or recreational activities do not constitute major life activities for purposes of the ADA.  *See MacKenzie v. Denver*, 414 F.3d 1266, 1275 (10th Cir. 2005) (indicating that the plaintiff's "contention that physical exertion constitutes a major life activity is wholly without merit" and that "physical exertion . . . does not constitute a major life activity under the ADA"); *Martinez v. City of Roy*, 1998 U.S. App. LEXIS 5906, *7 (10th Cir. Mar. 26, 1998) ("Concluding . . . that recreational swimming is not a major life activity under the ADA."); *Hennagir v. Utah Dep't of Corr.*, 2008 U.S. Dist. LEXIS 32709, *17 (D. Utah April 21, 2008) ("Strenuous physical activity, however, is not a major life activity.  Running and jumping are not major life activities.  Bicycling is also not a major life activity." (citations omitted));

*Ruggles v. Keebler Co.*, 224 F. Supp. 2d 1295, 1301 (D. Kan. 2002) (indicating that running does not constitute a major life activity); *Faroh v. Sedgwich County*, 2002 U.S. Dist. LEXIS 13491, **11-12 (D. Kan. July 12, 2002) (finding that "[r]ecreation is not a 'major life' activity" and that "mountain biking, weight lifting, and roller blading are not major life activities").

But even if the court were to accept for purposes of Capitol Roofing's Motion that all of the activities upon which Lavadie relies are recognized major life activities under the ADA, Lavadie has not offered sufficient evidence to raise a genuine issue of fact regarding whether his impairment "substantially limits" his ability to engage in any of these activities. In determining whether an individual's impairment substantially limits one or more major life activities, the term "substantial" must be "interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota*, 534 U.S. at 197. "'Substantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.'" *Id.* at 196. In order to be substantially limited in performing a particular major life activity, "an individual must have an impairment that *prevents* or *severely restricts* the individual from doing activities that are of central importance to most people's daily lives. The impairment's impact must also be permanent or long-term." *Id.* at 198 (emphasis added).[1]

> It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires those "claiming the Act's protection . . . to prove a disability

---

[1] *See also* 29 C.F.R. § 1630.2(j)(1) (defining the term "substantially limits" as "[u]nable to perform a major life activity that the average person in the general population can perform" or [s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity"); 29 C.F.R. § 1630.2(j)(2) (describing the factors to be considered in determining whether an individual is "substantially limited" as including "[t]he nature and severity of the impairment," "[t]he duration or expected duration of the impairment," and "[t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment"); *Berry*, 490 F.3d at 1217 n.5 (noting that the Court has expressly declined to determine the amount of deference due to the EEOC regulations, including 29 C.F.R. § 1630.2).

8

by offering evidence that the extent of the limitation [caused by their impairment] in terms of their own experience . . . is substantial." *Albertson's, Inc. v. Kirkingburg*, [527 U.S.] at 567.

*Toyota*, 534 U.S. at 198.

> ### a.  Working

Lavadie contends that his impairment substantially limits his ability to engage in the major life activity of working.  When "working" is the major life activity under consideration, "substantially limits" means

> "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities.  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."

*Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 491 (1999) (quoting 29 C.F.R. § 1630.2(j)(3)(i)). A "class of jobs" is defined as "'the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.'" *Sutton v. United Air Lines, Inc.*, 130 F.3d 893, 904 (10th Cir. 1997) (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)).  A "broad range of jobs in various classes" is defined as "'the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment.'"  *Id.* (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(C)).

The record in this case makes clear that Lavadie was severely injured as a result of his work-related accident in January of 2000.  But by December of 2000, Lavadie's doctor, James

M. Morgan, M.D., had determined that Lavadie could "go about his regular activity" and could return to work as a roofer with no restrictions except that he not walk or stand on pitched roofs. (Opposition, Ex. 2 (dkt. 22-4), at [21] (Medical Note, dated December 7, 2000).)  Beginning in December of 2000, Lavadie began performing roofing work that did not require him to stand or walk on pitched roofs.  Later, although Lavadie stopped working on hot tar roofs because standing and walking in tar was hurting his ankles, he continued to perform roofing work on other types of flat roofs.  Lavadie performed full-time roofing work for Capitol Roofing with these limited restrictions from December of 2000 to July of 2002.

Lavadie's medical records indicate that around the time of his termination, Lavadie was suffering pain in both of his ankles and was seeking medical treatment to relieve such pain, especially with respect to his right ankle.  Around that same time, Lavadie's doctor questioned whether it was reasonable or in Lavadie's best interest for Lavadie to continue working as a roofer.  Specifically, in discussing treatment options for Lavadie's ankle pain, Dr. Morgan indicated that "it would be reasonable for [Lavadie] to consider changing his occupation and return to school in order to buy some more time before he undergoes a fusion."  (Opposition, Ex. 2 (dkt. 22-5), at [7] (Medical Note, dated June 20, 2002).)  Dr. Morgan also wrote in a letter that was generally addressed to "To Whom It May Concern," that it was in Lavadie's "best interest" to "avoid any climbing, prolonged walking, standing, carrying or lifting" and "to change vocations where he would not be required to be on his feet."  (*Id.* at [9] (Letter, dated July 9, 2002).)[2]

Dr. Morgan's concerns and recommendations, however, must be viewed in relation to

---

[2]It is unclear from the record to whom this letter was intended or whether and/or to whom this letter was sent.

Lavadie's admissions in this lawsuit that not only is he able to work now, but he was also able to work at the time he was terminated from Capitol Roofing.  (*See* Opposition at 18 ("Lavadie[] admi[ts] that (by being careful to avoid work activities that cause pain and by taking pain killers on a daily basis and soaking his ankles every night) he can work . . . ."); Capitol Roofing's Memorandum in Support of Motion for Summary Judgment (dkt. no. 19) ("Supporting Memo.") at 7 ¶ 31 ("When Plaintiff spoke with Mr. Zimmerman on June 24, 2002, he believed he could continue to work on flat roofs as long as that didn't involve walking in hot tar, but did not tell Mr. Zimmerman that."); Opposition at 9 ¶ 31 (indicating that paragraph thirty-one of the Statement of Uncontested Facts in Capitol Roofing's Supporting Memo. is "undisputed"); Tr. 5/29/08, at 9:1 (Lavadie "could still work") (Mr. Holdsworth); *id.* at 32:23 to 33:2 ("You recall that when he's terminated, even though Mr. Lavadie says he could work, that he could do single-ply roofing, apparently a jury could conclude when Mr. Zimmerman just terminated him the employer could have concluded he can't work at all.") (Mr. Holdsworth).)  That Lavadie was able to perform the same type of roofing work that he had previously been performing for Capitol Roofing at the time of his termination is supported by the written statement he provided the Utah Labor Commission within a month after he was terminated by Capitol Roofing.  In his statement, Lavadie provided that although his injuries were painful, they did not restrict him from performing roofing work for Capitol Roofing.  (Supporting Memo. at 7 ¶ 34; Opposition at 10 ¶ 34; Opposition, Ex. 3 (dkt. no. 22-6), at [2] ("My injuries in no way prohibit me from performing my duties, it is painful for me, but I have managed to work for the last 22+ months with it.  The thing is I just wanted to look over my options.").)  Moreover, Lavadie's ability to work since his termination is evidenced by his extensive work history in the roofing business

from late 2002, to at least September of 2007.  (*See* Supporting Memo. at 5 ¶¶ 18-22, 7-9 ¶¶ 35-

49; Opposition at 7-8 ¶¶ 18-22, 10-11 ¶¶ 35-49.)  In late 2002, shortly after his termination from

Capitol Roofing and after having his right ankle fused—a procedure that Lavadie's doctor

described as potentially limiting Lavadie's range of motion and mobility—Lavadie returned to

work as a roofer.  And as of September 5, 2007, the date of his deposition in this case, Lavadie

had been performing roofing or similar work for companies other than Capitol Roofing for

nearly five years.

Besides failing to offer evidence that his impairment significantly restricted his ability to

perform the type of roofing job from which he was terminated, Lavadie has also failed to offer

any evidence showing that his impairment significantly limited his ability to perform either "jobs

utilizing similar training, knowledge, skills or abilities" within his geographical area or "jobs *not*

utilizing similar training, knowledge, skills or abilities" within his geographical area.  *Sutton*,

130 F.3d at 904 (quoting 29 C.F.R. § 1630.2(j)(3)(ii)(B)-(C)) (emphasis added).  Although

Lavadie is not required to make an "'onerous evidentiary showing'" identifying "'the exact

number of jobs using similar or dissimilar skills in a certain geographic area,'" he did have the

burden of presenting "'evidence of general employment demographics and/or of recognized

occupational classifications that indicate the approximate number of jobs (e.g., "few," "many,"

"most") from which [he] would be excluded because of [his] impairment.'" *EEOC v. Heartway

Corp.*, 466 F.3d 1156, 1164 (10th Cir. 2006) (quoting EECO Compliance Manual § 902.4

(quoting 29 C.F.R. pt. 1630 app.)); *see also Bolton v. Scrivner*, 36 F.3d 939, 943-44 (10th Cir.

1994) (indicating that summary judgment against the plaintiff's ADA claim was proper where

the plaintiff failed to produce evidence relevant to the number and type of jobs from which the

plaintiff was disqualified, the geographical area to which the plaintiff had reasonable access, and the plaintiff's job expectations and training).

Because it is undisputed that Lavadie was able to perform roofing work at the time of his termination and has been able to perform roofing and other similar work for over five years since his termination, and because Lavadie has failed to offer any evidence whatsoever regarding jobs in his geographical area from which he is disqualified due to his impairment, the court concludes that a reasonable jury could not determine that Lavadie's impairment substantially limits his ability to work.

### b.    Other Activities

Having determined that the record is insufficient to establish that Lavadie was substantially limited in the major life activity of working, the court now considers Lavadie's contention that he is substantially limited in the alleged major life activities of walking, standing, lifting, carrying, pushing, pulling, bending, stooping, squatting, kneeling, climbing, and engaging in sporting or recreational activities.

Lavadie provides a general and limited description of how his impairment limits his ability to perform these various activities. According to Lavadie,

> [h]e has permanent damage to both legs. He has markedly limited motion in his ankles and feet. He has difficulty with walking, especially on uneven ground or for distance, climbing, lifting and carrying. He cannot squat. He has difficulty kneeling consistently. See Exhibit 5. He is limited in his ability to engage in the type of recreational athletic activities he participated in quite extensively prior to the accident. See Exhibit 1 at 35-36. He has continual chronic pain in both ankles and knees. See Exhibit 2. See Exhibit 5. [He] alleges the injuries he suffered have resulted in an impairment that is permanent and disabling to many of his life activities.

(Opposition at 16.) While Lavadie acknowledges that "[w]ith the assistance of pain medication,

[he] may be able to engage in many ordinary activities," he contends that "there are a number of activities he cannot do at all or can do only with pain and time.  He can't run, jump, play team sports, hunt without pain killers, he can't ski, scuba-dive, or play outside with his children."  (*Id.* at 18-19.)  In Lavadie's opinion, this "evidence raises a genuine issue of material fact that his impairment substantially limits one or more of his major life activities."  (*Id.* at 19.)

In support of his allegations, Lavadie cites generally to "Exhibit 2" to his Opposition, which consists of approximately fifty pages of medical records dated from January 1, 2000 (the date of his accident) to January 18, 2007 (over four years after he was terminated by Capitol Roofing).  Lavadie does not provide any specific citation to any particular medical record or records upon which he relies to support his claims regarding his limitations.  Lavadie also supports his allegations by citing to two pages from the transcript of his deposition in this case, which is attached to his Opposition as "Exhibit 1."  (*See* Opposition, Ex. 1 (dkt. no. 22-2).)[3] This portion of Lavadie's deposition contains Lavadie's description of "problems" he suffered as a result of his work-related injury.  During this portion of his deposition, Lavadie generally testified that although he was very active in sports such as rugby, softball, skiing and scuba diving before his work-related accident, he is no longer able to participate in sports as a result of his injuries.

Besides his general claims and general citations to the record, Lavadie does not provide

_____

[3]Lavadie also cites generally to "Exhibit 5" to his Opposition, which contains a "Determination and Order" that was recommended by the Utah Antidiscrimination & Labor Division ("UALD") in November of 2005 (the "UALD's Order").  (*See* Opposition, Ex. 5 (dkt. no. 22-8).)  While the UALD's Order contains a number of conclusory statements regarding certain limitations that Lavadie suffered as a result of his impairment, it does not specify or provide any citation to the source of information upon which those conclusions were based.  Accordingly, the court is unable to independently verify the information or conclusions contained in the UALD's Order.  The court also notes that Lavadie's counsel acknowledged during the hearing on the Motion that Lavadie's claim with the UALD was ultimately abandoned and that the UALD's Order has no preclusive effect on his claims in this matter, but is merely persuasive authority.  (Tr. 5/29/08, at 5:9-14 (Mr. Holdsworth).)

the court with any testimony—either from his deposition or by affidavit—or point to any particular medical record specifically describing the extent to which Lavadie's impairment has impacted his ability to perform the activities upon which he relies or how such limitations have impacted Lavadie's day-to-day life.  Lavadie neither describes nor points to any portion of the record that specifies the extent of his limitations with respect to standing, pushing, pulling, bending or stooping.  And while Lavadie generally claims to have "difficulty" with "kneeling consistently," "climbing, lifting and carrying," (Opposition at 16), he does not provide any testimony or citation to the record to support an inference that in terms of his own experience, his limitations with respect to such activities are substantial.

Lavadie also claims to have "difficulty" walking, "especially on uneven ground or for distance."  (Opposition at 16.)  In his Complaint, Lavadie alleged that he could not "walk 1/5 of a mile as rapidly as a normal person," that "walking 1/5 of a mile cause[d] increased ankle pain," and that he wore "custom orthotic boots."  (Complaint at 6-7 ¶ 18.)  At most, Lavadie describes moderate restrictions on his ability to walk.  "[M]oderate restrictions on the ability to walk[, however,] do not amount to a substantial limitation."  *McCoy v. USF Dugan, Inc.*, 42 Fed. Appx. 295, 297 (10th Cir. 2002) (citing cases); *see also McClurg v. GTECH Corp.*, 61 F. Supp. 2d 1150, 1159 (D. Kan. 1999) (indicating that the fact that plaintiff "uses a leg brace on occasion, walks with a limp, and sits with his leg extended is not enough evidence to allow a reasonable juror to conclude that the plaintiff's capacity for walking or sitting is significantly restricted" and citing cases).

Lavadie also claims that as a result of his impairment, he is limited in his ability to participate in sporting and recreational activities.  Specifically, Lavadie claims that he can't "run,

jump, play team sports, . . . ski, scuba-dive, or play outside with his children."  (Opposition at 18.)  As indicated above, various courts within the Tenth Circuit have concluded that engaging in sporting or recreational activities is not a major life activity under the ADA.  But even if it were, Lavadie has not offered sufficient evidence to raise a triable issue of fact regarding whether the extent of his limitation in terms of his own experience is substantial.  Lavadie testified during his deposition that he was "very active" before his accident.  (Opposition, Ex. 1 (Transcript of Deposition of Charles M. Lavadie, dated September 5, 2007), at [3].)  Lavadie also alleges that before the accident, sporting activities "were of central importance" in his life and that he participated in certain "recreational athletic activities" "quite extensively." (Opposition at 16, 18.)  Lavadie, however, fails to offer any evidence or testimony specifically indicating how frequently, regularly, or consistently he actually participated in such activities before his accident or that in terms of his own experience, his inability to do so now has impacted his life in a considerable manner or to a large degree.  While the court must view the record in the light most favorable to Lavadie, Lavadie's bald and conclusory statements are insufficient to raise a genuine issue of fact.  *Berry*, 490 F.3d at 1218 n.7 (citing *Heisler v. Metropolitan Council*, 339 F.3d 622, 628 (8th Cir. 2003) for proposition that "[B]ald assertions that one is limited in a major life activity are insufficient to withstand summary judgment").

Finally, although Lavadie asserts that "[h]e cannot squat," he has not offered any evidence that this limitation has had a considerable impact on his day-to-day life.

It is entirely conceivable that Lavadie's impairment may have diminished his physical capacities to some degree.  However, the record in this case indicates that to the extent that Lavadie has difficulties or limitations in his ability to walk, stand, lift, carry, push, pull, bend,

stoop, squat, kneel, climb, or engage in sporting or recreational activities, those difficulties or limitations have not prevented or severely restricted Lavadie from leading a normal, everyday life.  Lavadie is able to engage in full-time work.  Since he was terminated as a roofer for Capitol Roofing, Lavadie has had several jobs wherein he has been able to perform a variety of physical tasks such as installing single-ply roofs, fabricating and installing sheet metal on roofs, installing sheet metal duct work for heating and air conditioning systems in buildings, taking roof measurements, operating a hand brake to bend metal, and climbing and performing work from ladders.  In addition, Lavadie is able to provide the primary care for his three children.  He also has the ability to drive a car, mow the lawn, play pool, and with the assistance of medication, hunt and fish.  In fact, Lavadie admits that with the assistance of pain medication, he is able to engage in "many ordinary activities."  (Opposition at 18.)

The burden rests with Lavadie, as the plaintiff, to offer more than conclusory or general statements about how his impairment has limited his ability to engage in the activities upon which he relies.  Lavadie has failed to satisfy his burden.  Accordingly, the court concludes that the evidence in the record is insufficient to raise a triable fact issue regarding whether Lavadie's impairment substantially limits his ability to walk, stand, lift, carry, push, pull, bend, stoop, squat, kneel, climb, or engage in sporting or recreational activities.

Because the record in this case is not sufficient to allow a reasonable jury to determine that Lavadie is substantially limited in any of the asserted major life activities upon which he relies—working, walking, standing, lifting, carrying, pushing, pulling, bending, stooping, squatting, kneeling, climbing, or engaging in sporting or recreational activities—the court concludes that Lavadie has failed to raise a genuine issue of fact as to whether he satisfies the

17

ADA's definition of "disability" in 42 U.S.C. § 12102(2)(A).

## 2.    Record of an Impairment

An individual satisfies the definition of "disability" under the ADA if he or she has "a record" of an impairment that substantially limits one or more major life activities.  42 U.S.C. § 12102(2)(B).  "[A] claimant may be deemed to have a 'record' of disability either by having a history of substantial limitation of a major life activity or by having been misclassified as having such an impairment."  *Berry*, 490 F.3d at 1219 (citing 29 C.F.R. § 1630.2(k)).

Lavadie claims that he meets this definition of disability because "Capitol Roofing maintained and/or had access to a workers' compensation medical file on Mr. Lavadie (which detailed the nature and extent of his injuries and the scope of his physical limitations)." (Opposition at 19 n.3.)[4]  According to Lavadie, when he asked to be reassigned to the metal shop shortly before he was terminated, "Capitol Roofing and/or its insurance representatives" had access to these records, which substantiated "the nature and extent of [his] disability."  (*Id.*)

But Lavadie has neither produced the "workers' compensation medical file" to the court, nor provided any explanation of the nature or content of the records that were contained in that file.[5]  Moreover, although Lavadie claims that Capitol Roofing "had access" to his workers'

---

[4]In his Opposition, Lavadie devotes only one footnote consisting of two paragraphs to his claim that he has a record of an impairment.  Neither party addressed this portion of Lavadie's argument during the hearing on May 29, 2008.

[5]While Exhibit 2 to Lavadie's Opposition consists of a compilation of medical records, Lavadie refers to Exhibit 2 as "Mr. Lavadie's medical records," (Opposition, at 4 ¶ 8), and not as his "*workers' compensation medical file*."  In the absence of any specific indication by Lavadie that Exhibit 2 to his Opposition constitutes the "workers' compensation medical file" referred to in relation to his "record of impairment" argument, the court will not make such an assumption.  However, even if the court were to assume that Exhibit 2 to Lavadie's Opposition is the same thing as the "workers' compensation medical file" that Lavadie refers to, the court has determined that Lavadie has failed to establish that those records are a sufficient basis on which a jury could reasonably conclude that Lavadie's impairment substantially limited his ability to engage in one or more major life activities, as discussed above.

18

compensation file, he neither alleges nor provides any evidence that anyone at Capitol Roofing

actually accessed, considered, or relied on such records in relation to the decision to terminate

Lavadie.  In the absence of such evidence, the court determines that a reasonable jury could not

conclude that Lavadie meets the ADA's definition of "disability" by having a record of

impairment.

### 3.    Regarded as Having an Impairment

Lavadie also contends that he qualifies as having a disability under the ADA's "regarded

as" definition of disability.  42 U.S.C. § 12102(2)(C).  In order to succeed on a "regarded-as"

disability claim,

> a plaintiff must show that an employer has mistaken beliefs about the plaintiff's
> abilities: the employer "must believe either that one has a substantially limiting
> impairment that one does not have or that one has a substantially limiting impairment
> when, in fact, the impairment is not so limiting." *Sutton v. United Air Lines, Inc.*,
> 527 U.S. 471, 489, 119 S. Ct. 2139, 144 L. Ed. 2d 450 (1999).  Moreover, the
> employer must mistakenly believe that the impairment substantially limits the
> employee in one or more major life activities. *See id.* (stating that the "regarded as"
> standard is met when an employer "mistakenly believes that a person has a physical
> impairment that substantially limits one or more major life activities" or when an
> employer "mistakenly believes that an actual, nonlimiting impairment substantially
> limits one or more major life activities").

*Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1190 (10th Cir. 2007).

According to Lavadie, Capitol Roofing mistakenly regarded him as being substantially

limited in the major life activity of working.[6]  Lavadie alleges that the fact that Capitol Roofing

did not transfer him to the metal shop, but instead terminated him is "evidence that Capitol

Roofing regarded [him] as disabled" and is sufficient evidence to allow a jury to "reasonably

---

[6]This argument, which appears to be inconsistent with Lavadie's position that his impairment did in fact
substantially limit his ability to engage in several major life activities—including working—is apparently alleged in
the alternative.

infer that Capitol Roofing viewed [him] as incapable of doing *any* of a broad range of jobs within Capitol Roofing's company."  (Complaint at 7-8 ¶ 20 (emphasis in original); *see* Opposition at 20.)

In order to raise an issue of material fact as to whether Capitol Roofing regarded him as disabled in the major life activity of working, Lavadie must present some evidence that Capitol Roofing mistakenly regarded his impairment as significantly restricting his ability to perform either a class of jobs or a broad range of jobs in various classes as compared to similarly trained persons.  *Jones*, 502 F.3d at 1191; *Heartway Corp.*, 466 F.3d at 1162.  "[I]t is particularly difficult for a plaintiff to prevail on this type of claim."   *Heartway Corp.*, 466 F.3d at 1162.

> "Proving that an employee is regarded as disabled in the major life activity of working takes a plaintiff to the farthest reaches of the ADA.  It is a question embedded almost entirely in the employer's subjective state of mind.  Thus, proving the case becomes extraordinarily difficult.  Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer thought that his disability would prevent him from performing a broad class of jobs.  As it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations, the plaintiff's task becomes even more difficult."

*Id.* (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001)).

Shortly before he was terminated, Lavadie represented to Capitol Roofing that his doctor recommended that he no longer work on roofs.  Lavadie requested a position in the metal shop—a position he had previously held for a limited time while he was initially recovering from his injuries.  Capitol Roofing's termination of Lavadie is perhaps evidence that Capitol Roofing, relying on Lavadie's own representations regarding his limitations, may have believed that Lavadie's impairment restricted his ability to perform the type of roofing work that he had previously been performing for Capitol Roofing.  But Lavadie has not offered any evidence that

Capitol Roofing mistakenly believed that Lavadie's impairment restricted his ability to perform the work required in the metal shop.  There is no evidence in the record that Capitol Roofing decided to terminate Lavadie instead of reassigning him to the metal shop because of such a mistaken belief regarding his impairment.  Instead, Lavadie himself admits that at the time he asked to be reassigned, there were already two employees filling the available positions in the metal shop.

Lavadie has also failed to offer any evidence in support of his claim that "Capitol Roofing viewed [him] as incapable of doing *any* of a broad range of jobs within Capitol Roofing's company."  (Opposition at 20 (emphasis in original).)  Lavadie does not specify what those other jobs were.  Lavadie also does not allege or offer any evidence showing that he asked to be considered for any job other than one in the metal shop or that Capitol Roofing refused to consider him for any other job based on its mistaken belief regarding his restrictions.

Finally, besides alleging that Capitol Roofing mistakenly believed that his impairment significantly restricted his ability to perform "a broad range of jobs *within Capitol Roofing's company*," (Opposition at 20 (emphasis added)), Lavadie has not even alleged, let alone offered any evidence, that Capitol Roofing believed him to be severely restricted in performing a class of jobs or a broad range of jobs outside of those offered by Capitol Roofing but within his geographical area.  *See Heartway Corp.*, 466 F.3d at 1164 (indicating that the plaintiff's geographical area is relevant in defining what constitutes a "class of jobs" and a "broad range of jobs"); *Jones*, 502 F.3d at 1192 (noting that the determination of what constitutes a "broad range of jobs" depends on the range of jobs available to the plaintiff within his geographical area rather than the range of jobs offered by his former employer).

21

Viewing the record in the light most favorable to Lavadie, the court concludes that a reasonable jury could not determine that Capitol Roofing mistakenly believed Lavadie to be substantially limited in the major life activity of working.  Thus, Lavadie has failed to raise a genuine issue of fact as to whether he satisfies the ADA's "regarded as" definition of disability.

As discussed above, Lavadie has simply failed to raise a triable issue of fact with respect to the first element of a prima facie case of disability discrimination—that he has a disability as that term is defined by the ADA.  Lavadie, therefore, cannot succeed on either his first or second causes of action, which claim that Capitol Roofing violated the ADA by failing to accommodate his disability and by terminating him on the basis of his disability.  Accordingly, Capitol Roofing is entitled to summary judgment on Lavadie's first and second causes of action.

**B.      Lavadie's Breach of Contract Claim**

Lavadie claims as his third cause of action that Capitol Roofing terminated him in violation of an implied-in-fact employment contract that arose based on an oral assurance made to Lavadie by Capitol Roofing's Vice President, Keith McComb.  According to Lavadie, about a year or so after his work-related accident, during a discussion between Lavadie, McComb, and another Capitol Roofing employee regarding what had happened on the day of Lavadie's fall, McComb told Lavadie "As long as you want to work here, you will have a job."  (Opposition at 31.)  Lavadie contends that McComb's promise created an implied-in-fact contract that precluded Capitol Roofing from terminating him in July of 2002.

"In Utah, an employee hired for an indefinite period is presumed to be an employee at will who can be terminated for any reason whatsoever so long as the termination does not violate a state or federal statute." *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 100 (Utah 1991); *see*

*Hodgson v. Bunzi Utah, Inc.*, 844 P.2d 331, 333 (Utah 1992) ("When an employment agreement

mentions no period of duration, employment is presumed to be at will.").  An employee may

rebut this presumption by demonstrating the existence of an implied-in-fact contract provision

limiting the employer's right to terminate the employee.  *Johnson*, 818 P.2d at 1000-02.  "[T]he

employee has the burden of establishing the existence of an implied-in-fact contract provision,

that is, the employee must show that although there was no express contract provision to this

effect, the parties nevertheless agreed that the employment would not be at will."  *Id.* at 1001.

"[F]or an implied-in-fac[t] contract term to exist, it must meet the requirements for an offer of a

unilateral contract."  *Id.* at 1002.  In other words,

> [t]here must be a manifestation of the employer's intent that is communicated to
> the employee and sufficiently definite to operate as a contract provision.  Furthermore,
> the manifestation of the employer's intent must be of such a nature that the employee
> can reasonably believe that the employer is making an offer of employment other
> than employment at will.

*Id.* at 1002 (footnote omitted).

An employer's oral statement may be "evidence of the employer's intention to modify

the at-will relationship . . . ."  *Robertson v. Utah Fuel Co.*, 889 P.2d 1382, 1385 (Utah Ct. App.

1995) (citing *Johnson*, 818 P.2d at 1002; *Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1044

(Utah 1989)).  But "[i]n order for . . . oral statements to establish an implied-in-fact contract,

such evidence must be strong enough to overcome the presumption of at-will employment and

any inconsistent written policies and disclaimers."  *Hodgson*, 844 P.2d at 334.

"The existence of an implied-in-fact agreement is normally a question of fact left to the

jury."  *Wood v. Utah Farm Bureau Insur. Co.*, 19 P.3d 392, 397 (Utah Ct. App. 2001).

"However, if the evidence presented is such that no reasonable jury could conclude that the

parties agreed to limit the employer's right to terminate the employee, it is appropriate for the court to decide the issue as a matter of law." *Johnson*, 818 P.2d at 1001.

On October 8, 1999, Lavadie signed an application for employment seeking a position with Capitol Roofing. The employment application provided in part:

> APPLICANT AGREEMENT *(Read carefully before signing.)*
> . . .
> I understand this is a preliminary application and not a contract to employ me. Furthermore, in the event I am employed, my employment shall be completely voluntary and may be terminated at will at any time by either myself or the company. I understand that no one other than the company president has authority to enter into any employment agreement to the contrary.

(Affidavit of Brent Zimmerman (dkt. no. 20), Ex. 1 (Application for Employment) (emphasis in original).) Capitol Roofing hired Lavadie after receiving his application. Besides the employment application, the parties have not referred to any other written employment agreement entered into between Lavadie and Capitol Roofing, and Lavadie does not claim to have been hired by Capitol Roofing for a definite period of time.

Lavadie contends that there is a factual question regarding whether McComb's alleged promise to Lavadie that "As long as you want to work here, you will have a job," rebuts the presumption that he was an at will employee of Capitol Roofing. According to Lavadie, a jury could reasonably conclude that McComb's promise formed an implied-in-fact contract term that limited Capitol Roofing's ability to terminate Lavadie. Capitol Roofing, on the other hand, argues that even if McComb made the statement that Lavadie alleges he made, McComb's statement is too unspecific and general to create an enforceable contract term. The court agrees with Capitol Roofing.

Taken as true, McComb's alleged statement was a promise that as long as Lavadie

24

wanted to work for Capitol Roofing and regardless of any circumstances that could arise in the future, Capitol Roofing would not terminate Lavadie for any reason.  In other words, McComb's statement was an unlimited promise that Lavadie would never be terminated.[7]  Without more, this type of open-ended, unspecific promise is not sufficiently definite to create an implied-in-fact contract provision relinquishing Capitol Roofing's right to terminate Lavadie at will or to reasonably induce Lavadie to believe that his employment at Capitol Roofing would be other than at will.  *See Wood*, 19 P.3d at 398-99 (determining that an employee's allegation that shortly after three other employees were terminated, the employer promised the employee that "what happened [to the other employees] doesn't apply to you," was "not definite enough to establish an implied-in-fact contract term," but instead "was in the nature of 'vague encouragement' and 'hyperbolic optimism,' which is insufficient to convey a clear and unequivocal intention to relinquish the right to terminate at will").

The court's conclusion likely would be different if McComb's oral assurance to Lavadie could reasonably be interpreted as including a more specific or definite promise, such as a promise that Capitol Roofing: would only terminate Lavadie for cause; would follow a certain procedure before terminating Lavadie; would employ Lavadie for a specific, but limited term; or would not terminate Lavadie for a particular reason, such as for taking extensive medical leave. *Sanderson v. First Security Leasing Co.*, 844 P.2d 303, 307 (Utah 1992) (determining that an employer's alleged promise not to fire an employee "for a *certain reason*" "could support a finding of an implied-in-fact contract term limiting [the employer's] freedom to discharge for

---

[7]According to Lavadie's counsel, the employment arrangement between Lavadie and Capitol Roofing following McComb's promise was as follows: "it was to work for the company in whatever capacity the company wanted Mr. Lavadie to work for it and whatever capacity Mr. Lavadie wanted to work for it."  (Tr. 5/29/08, at 28:17-20; *see id.* at 27:24 to 28:25.)

any reason whatsoever" (emphasis added)); *Wood*, 19 P.3d at 398 (determining that where an employer allegedly promised that an employee would not be terminated *unless* he failed to meet certain sales goals, an issue of fact existed regarding whether an implied-in-fact contract existed); *Robertson*, 889 P.2d at 1385 (indicating that the presumption that employment is at will "'can be overcome by an affirmative showing by the plaintiff that the parties expressly or impliedly intended a *specified term* or agreed to terminate the relationship for cause alone'" (quoting *Berube*, 771 P.2d at 1044) (emphasis added)). But as alleged by Lavadie, McComb's statement cannot be so interpreted. Accordingly, Lavadie has failed to offer sufficient evidence to establish the existence of an implied-in-fact contract term limiting Capitol Roofing's ability to discharge Lavadie. Capitol Roofing is therefore entitled to summary judgment on Lavadie's breach of contract claim.[8]

### C.   Lavadie's Wrongful Termination Claim

As his fourth cause of action, Lavadie claims that Capitol Roofing wrongfully terminated him for seeking benefits under the Utah Workers' Compensation Act. In support of his claim, Lavadie relies on *Touchard v. La-Z-Boy Inc.*, 148 P.3d 945, 952 (Utah 2006), where the Utah Supreme Court determined that "[a]n employer who terminates an employee in retaliation for the employee's exercise of [his or her workers' compensation rights] has violated a clear and substantial public policy and may be sued for wrongful discharge by the discharged employee."

Lavadie concedes that Capitol Roofing reported his January 31, 2000 work-related accident to the Workers Compensation Fund of Utah and that Capitol Roofing did not oppose his

---

[8]Having determined that McComb's alleged statement, taken as true, is insufficient to establish the existence of an implied-in-fact contract term rebutting the presumption that Lavadie's employment with Capitol Roofing was at will, the court need not address whether McComb, Capitol Roofing's Vice President, had the authority to make such a promise to Lavadie.

workers' compensation claim.  It is also undisputed that Capitol Roofing continued to employ Lavadie for nearly two and a half years after his accident occurred and was reported.  Apparently recognizing that the record does not support a claim that Capitol Roofing terminated him for *reporting* his workers' compensation claim, Lavadie instead argues that Capitol Roofing wrongfully terminated him because "he was continuing to *pursue* workers' compensation benefits."  (Opposition at 34 (emphasis in original).)  Specifically, Lavadie points to the fact that he was terminated shortly after he told Capitol Roofing that because of his impairment, he was going to need to undergo periodic surgeries or have his right ankle fused.  Lavadie claims that besides the fact that he needed further medical treatment—which according to Lavadie would "continu[e to] impact . . . Capitol Roofing's workers' compensation costs"—there was simply no other reason for Capitol Roofing to terminate him.

 Lavadie, however, has failed to offer any evidence that Capitol Roofing's workers' compensation expenses were determined or in any way impacted by the level of medical treatment that Lavadie received.  There is simply no evidence that Capitol Roofing's workers' compensation costs would have increased had Lavadie received additional medical care for his impairment while still employed by Capitol Roofing or that Capitol Roofing's workers' compensation costs decreased when Lavadie was terminated.

There is also no evidence that Lavadie's entitlement to workers' compensation benefits was reduced or in any way altered as a result of his termination from Capitol Roofing.  Instead, Lavadie acknowledges that his workers' compensation benefits paid for the ankle surgery he received after his termination from Capitol Roofing.

Finally, Lavadie's argument that there was "no independent reason to fire [him]" other

than the fact that he was going to need additional medical treatment ignores the relevant fact in

this case that shortly before he was terminated, Lavadie told Capitol Roofing that based on his

doctor's recommendation, he could no longer work on roofs because it was not good for his

ankles.  (Opposition at 36; *see* Supporting Memo. at 6-7 ¶ 30; Opposition at 9 ¶ 30.)  In light of

this fact, the court determines that Capitol Roofing's failure to provide Lavadie with a

performance-based reason for his termination and/or failure to follow a course of progressive

discipline before terminating Lavadie is insufficient, without more, to raise a triable issue of fact

regarding whether Capitol Roofing wrongfully terminated Lavadie for pursuing workers'

compensation benefits.

Viewing the record before the court in the light most favorable to Lavadie, the court

determines that Lavadie has failed to offer sufficient evidence to allow a reasonable jury to

conclude that Capitol Roofing fired Lavadie because he was pursuing his workers' compensation

rights.  Accordingly, Capitol Roofing is entitled to summary judgment on Lavadie's wrongful

termination claim.

## III.    CONCLUSION

Because Lavadie has failed to offer sufficient evidence to raise a triable issue of fact

regarding whether he has a disability as that term is defined by the ADA, Capitol Roofing is

entitled to summary judgment on the ADA claims asserted in Lavadie's first and second causes

of action.  Capitol Roofing is also entitled to summary judgment on Lavadie's third cause of

action for breach of contract because Lavadie has not produced sufficient evidence to establish

the existence of an implied-in-fact contract term limiting Capitol Roofing's ability to discharge

Lavadie at will.  Finally, because the record in this case is insufficient to allow a reasonable jury

to conclude that Capitol Roofing terminated Lavadie for pursuing workers' compensation benefits, Capitol Roofing is entitled to summary judgment on Lavadie's fourth cause of action for wrongful termination.

For the reasons set forth above,

**IT IS ORDERED** that Capitol Roofing's Motion for Summary Judgment (dkt. no. 18) is GRANTED.

**IT IS FURTHER ORDERED** that the substantive matter having been decided, the pretrial conference scheduled in this matter for August 6, 2008, at 1:30 p.m., is hereby vacated.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED this 5Th day of August, 2008.

BY THE COURT:

Bruce S. Jenkins
United States Senior District Judge

29